UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

BEST BUY STORES, L.P.,

Plaintiff,

v.

MANTECA LIFESTYLE CENTER, LLC,

Defendant.

_______________________________/

NO. CIV. 2:10-389 WBS KJN

MEMORANDUM AND ORDER RE: MOTION TO EXCLUDE PLAINTIFF'S EXPERTS AND MOTION FOR SUMMARY JUDGMENT

----oo0oo----

Plaintiff Best Buy Stores, L.P. ("Best Buy") brought this action against defendant Manteca Lifestyle Center, LLC ("Manteca") alleging various claims arising out of plaintiff's lease with defendant. Presently before the court are defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and motion to exclude plaintiff's experts.

I. Relevant Facts

In 2004, Poag & McEwen Lifestyle Centers, LLC ("Poag") began work on a shopping center to be located in Manteca,

California. (Best Buy App. Ex. 7 ("Poag Dep. II") at 188:18-21.) Like most of the shopping centers developed by Poag, this center was originally intended to be a "lifestyle" center, meaning that it would "cater to the retail needs and lifestyle pursuits of higher-income consumers." (Moseley Decl. ¶¶ 7-10, 12; Best Buy App. Ex. 42.) While Poag initially envisioned the Manteca center as a two-phase project with an initial phase of 650,000 to 715,000 square feet and a second phase of approximately 389,000 square feet, (Best Buy App. Ex. 10 ("Grambergs Dep. II") at 190:12-191:19; Best Buy App. Ex. 39 at MAN0008686), it ultimately sought approval from the city of Manteca for a lifestyle center of 650,000 to 746,000 square feet. (Grambergs Dep. II at 191:8-20; Best Buy App. Ex. 8 at MAN00006553.) Promenade Shops at Orchard Valley ("the Promenade"), the shopping center eventually developed in Manteca, is owned by Manteca, a limited liability company related to Poag. (Best Buy App. Ex. 42; id. Ex. 43; Manteca App. Ex. 7 ("Poag Dep. I") at 11:3-15.)

In 2007, Poag provided Best Buy with a site plan for the proposed Manteca shopping center and negotiation of a lease agreement began. (Moseley Decl. ¶¶ 17-19; Manteca App. Ex. 13 ("Moll Dep. I") at 116:6-117:1.) As Best Buy's Director of Real Estate during the relevant time period, Melissa Moseley was the primary person involved in negotiations on behalf of Best Buy. (Moseley Decl. ¶¶ 1, 6.) Her counterpart at Poag was Bud Moll. (Id. ¶¶ 17-21, 24.) A lease was executed by Manteca and Best Buy in July of 2007. (Manteca App. Ex. 1 at MAN0000451-52.)

Before entering into the lease at issue here, Best Buy had previously entered into a lease related to a Poag-developed

shopping center in Colorado known as Centerra. (Moseley Decl. ¶¶ 13-16.) In negotiating the Promenade lease, the parties used the Centerra lease as a starting point. (Id. ¶ 21; Manteca App. Ex. 17 (“Schram Dep. I”) at 114:21-115:2.)

The co-tenancy provision in the Centerra lease provided that co-tenancy would be established if two of the following five establishments were open and operating: a department store, a sporting goods store, a bookstore, a cinema, or no less than 150,000 square feet of smaller retail tenants. (Manteca App. Ex. 3 Art. 8.) In adapting this provision to the Manteca lease, Best Buy rejected Moll’s proposal that a 20,000 square foot retail store and 50,000 square feet of small retail stores be included as co-tenancy factors, instead requiring that between J.C. Penney, Bass Pro, and a cinema, two of these businesses be open for the co-tenancy condition to be met. (Manteca App. Ex. 13 (“Moll Dep. I”) at 133:6-135:5; id. Ex. 44 at MAN000534; id. Ex. 45 at MAN000557.) Best Buy also added a requirement that at least 60% of the “gross leasable area of the Shopping Center” be open before co-tenancy would be established. (Moll Dep. I at 133:11-35; Manteca App. Ex. 15 at MAN0000826; id. Ex. 1 Art. 8.)

The Co-Tenancy Condition the parties ultimately agreed to provides that:

> As used herein, the “Opening Co-Tenancy Condition” shall mean that, as of the Commencement Date, Tenant shall not be required to open for business unless sixty percent (60%) (not including Best Buy) of the gross leasable area of the Shopping Center are open and operating at the Shopping Center, or are to open concurrently with Tenant, including at least two (2) or more of the following tenants: (I) J.C. Penney; (ii) Bass Pro; (iii) a cinema.
>
> Should the Opening Co-Tenancy Condition not be

> satisfied, Tenant may either (I) delay opening for business until the Opening Co-Tenancy Condition is satisfied . . . or (ii) open for business and pay fifty percent (50%) of the monthly Rent (and any additional other costs without reduction) payable pursuant to the terms of this Lease until such time as the Opening Co-Tenancy Condition has been satisfied.

(Manteca App. Ex. 1 Art. 8.)

While the initial lease signed by the parties provided for an April 2009 opening, the parties later discussed the possibility of an October 2008 opening. (Manteca App. Ex. 4 ("Moseley Dep. I") at 316:4-13, 334:11-16; Moseley Decl. Ex. 4.) There was a concern on the part of Best Buy, however, about opening a store "without the appropriate cotenancy," (Manteca App. Ex. 51; id. Ex. 11 ("Matre Dep. I") at 98:25-99:13), or opening "while everyone [was] in the middle of construction and the site [was] a mess." (Best Buy App. Ex. 48.)

In early January 2008, Moll assured Moseley that, other than Dick's Sporting Goods, he was "not aware of anyone who won't be opening on time this October (except In Shape Health Club)." (Id.) In February, he notified her that J.C. Penney was delaying its opening until March 2009 and that some of the small retail shops, referred to as in-line shops, would also not open until 2009. (Moseley Decl. ¶ 41, Ex. 5.) In April 2008, Moll indicated to a construction project manager at Best Buy that Bass Pro, the theater, J.C. Penney, and "the balance of the center" would be open by March 2009. (Best Buy App. Ex. 50.)

Best Buy was concerned that if it opened before other parts of the Promenade, it would not be able to generate a profitable level of sales. (Moseley Decl ¶ 40, Ex. 4; see also Matre Dep. I at 99:25-102:8.) Although it noted that under the

Co-Tenancy Condition its operating costs would be lower if it opened in October because it would be on reduced rent "until the balance of the retail," (Moseley Decl. Ex. 5; Moseley Dep. I at 330:12-331:24; see also Manteca App. Ex. 51), Best Buy ultimately opted not to open its store in 2008.

As a result of the economic downturn that occurred in 2008, Manteca had a harder than expected time finding tenants interested in leasing space at the Promenade. (Best Buy App. Ex. 9 ("W. Moseley Dep. II") at 247:24-248:15; id. Ex. 14 No. 8.) Rather than constructing all of the buildings indicated on the Site Plan at once only to have many of them sit empty, Manteca decided to stagger construction. (Id. Ex. 14 No. 8 at 3; id. Ex. 15.)

In September 2008, Moll informed Moseley that (1) only Bass Pro and the cinema were opening in October 2008, (2) J.C. Penney was the only store opening in March 2009, (3) In Shape Health Club and Dick's Sporting Goods were not opening until July 2009, (4) only half of the "small lifestyle" space was leased, and (5) Hampton Inn would not open until July or August 2009. (Manteca App. Ex. 53.) A month later, Moseley contacted Moll and indicated that Best Buy was no longer interested in opening its store at the Promenade. (Moll Dep. I at 238:16-22.) Moll responded by reminding her that their lease agreement required Best Buy to open for at least one day. (Id. at 238:23-239:1.) According to Moll, Moseley then expressed interest in opening at a lower rent. (Id. at 239:2-4.) Moll responded that he did not have Best Buy's lease in front of him, and did not know exactly what Best Buy was permitted or not permitted to do. (Id. at

239:4-6.)

Moseley sent Moll an email the following month requesting an update on “signed leases and co-tenancy for Manteca.” (Manteca App. Ex. 27.) Moll informed her that “upon your scheduled opening next Spring we will have met your co-tenancy requirems [sic].” (Id.) He elaborated in a later email to Moseley that, according to his property administration department, Manteca would “meet the opening co-tenancy requirement per your lease once JC Penney opens at the center,” and that the square footage of J.C. Penney, Bass Pro, and the movie theater together “surpasses the 60% GLA requirement per your lease.” (Manteca App. Ex. 28.)

In December 2008, Moseley negotiated for forty-five days of free rent in exchange for Best Buy agreeing to open three weeks ahead of schedule. (Moseley Decl. ¶ 47; Manteca App. Ex. 29.) During these negotiations, Moseley clarified that Best Buy would receive one and a half months of free rent, and then “go to co-tenancy rent under the existing lease until such time as the co-tenancy is met (which would be our old opening date based upon your information on co-tenancy, or earlier if you meet it).” (Manteca App. Ex. 29.) The parties executed the amendment to the lease on January 19, 2009. (Manteca App. Ex. 2.)

Moseley and Kris Thorn, another Best Buy employee, exchanged emails discussing co-tenancy at the Promenade in early January 2009. (Id. Ex. 58; id. Ex. 59.) Thorn began the email exchange by asking Moseley “How did you/ can we verify your co-tenancy?” (Id. Ex. 59.) Moseley responded that she had spoken to other retailers and to defendant, and noted that both Bass Pro

and the theater were open. (Id. Ex. 58; id. Ex. 59.) When asked specifically who she talked to that "makes up the sixty percent," Moseley was unable to give an immediate answer. (Id. Ex. 59.) Instead she noted the square footage of Bass Pro and the theater and stated that she would "dig out [her] notes from the file in the morning." (Id.; Moseley Dep. I at 427:1-430:9.) Neither Moseley nor Thorn recall the circumstances that led to the email exchange or any follow-up in which the question of co-tenancy was definitively answered. (Moseley Dep. I at 427:1-430:9; Manteca App. Ex. 32 ("Thorn Dep. I") at 133:5-137:20.)

Moll updated Moseley on the status of the Promenade in January 2009, informing her that (1) the health club would not begin construction until March, (2) the hotel and Red Robin restaurant would not open until the fall, (3) Dick's Sporting Goods, which had been in talks to lease the building next to Best Buy's, was no longer interested in the property and the building next to Best Buy was not built yet, and (4) Manteca had partnered with Craig Realty, an outlet developer who was now pursuing outlet-type tenants for the Promenade. (Moseley Dep. I at 422:10-424:1; Manteca App. Ex. 57.) At this point, Craig Realty had assumed responsibility for securing tenants for the larger retail spaces, referred to as "pads." (Best Buy App. Ex. 23 ("Kern Dep. II") at 40:20-25; Best Buy App. Ex. 18.) Manteca elected not to pursue the deal with Dick's in order to allow more square footage for the outlet center Manteca was now pursuing in partnership with Craig Realty. (Best Buy App. Ex. 17; Poag Dep. II at 326:2-15.)

This was the first time that Manteca indicated that a

significant portion of the Promenade would not be open when the Best Buy store opened for business. (Moseley Decl. ¶¶ 42-49.) By this point, plans for Best Buy's opening had progressed too far for it to be feasible for Best Buy to change its opening date. (Moseley Dep. II at 422:10-24.)

When the Best Buy store at the Promenade opened at the end of February 2009, the cinema and Bass Pro were open. (Manteca App. Ex. 35.) By the time plaintiff was required to begin paying rent, J.C. Penney was also open. (Best Buy App. Ex. 46 No. 3.) Together, these three tenants represented approximately 290,000 square feet open and operating at the Promenade. (Manteca App. Ex. 35.) The total square footage constructed at that point was approximately 373,000, (id.), and the total square footage listed on the Site Plan attached to the lease was 743,908, (id. Ex. 1 Ex. B). The businesses open other than Best Buy's therefore represented approximately seventy-eight percent of the buildings built so far and approximately thirty-eight percent of the buildings shown on the Site Plan.

Shortly after Best Buy's store opened for business, Manteca emailed a co-tenancy calculation to Tricia Remus, an operating expense analyst at Best Buy responsible for processing real estate invoices. (Id. Ex. 35; Best Buy App. Ex. 79 ("Remus Dep. II") at 14:8-15:1, 17:6-18:15; Moseley Decl. ¶ 53.) Using the total constructed square footage as the gross leasable area of the shopping center, this calculation showed that seventy-eight percent of the gross leasable area was open and operating as of March 6, 2009. (Manteca App. Ex. 35.) Remus reviewed both the email and the parties' lease and entered information into

Best Buy's database indicating that the Co-Tenancy Condition had been met. (Remus Dep. II at 14:8-15:1; 38:5-39:23.) This was Remus' first time doing any work related to a co-tenancy condition on a Best Buy lease. (Id. at 77:18-78:10.)

In May 2009, Remus emailed Moseley and the Best Buy construction project manager assigned to the Promenade store seeking approval to submit a request to her managers that Best Buy begin making rent payments to Manteca. (Manteca App. Ex. 61.) In that email, Remus stated that "[c]o-tenancy was met on 3/6/09 when J.C. Penney opened and 78% percent of the shopping center was open." (Id.) After both Moseley and the construction project manager indicated that they approved, Remus submitted her rent payment request to a manager who would ultimately be responsible for determining the rent due under the Co-Tenancy Condition. (Remus Dep. II at 63:5-14; Best Buy App. Ex. 80 ("Beine Dep. II") at 7:9-8:11.)

By July, Best Buy had not made any rent payments to Manteca and Manteca entered a Notice of Default. (Manteca App. Ex. 38.) Remus responded to Manteca on July 30, 2008, protesting that the amount of rent demanded was too high. (Best Buy App. Ex. 56.) She explained that the Co-Tenancy Condition had not been met because the open businesses did not represent sixty percent of "the gross leasable area of the shopping center as shown on Exhibit B." (Id.)

After sending this email, Remus contacted Kate Beine, her supervisor and one of the managers responsible for determining the rent due under the Co-Tenancy Condition, noting that under Article 1 of the lease confusion might arise as to

whether the sixty percent occupancy condition referred to sixty percent of the planned center shown on the Site Plan or of the buildings fully constructed when Best Buy opened. (Id. Ex. 55.) Beine responded that she had spoken with Moseley about the "intent of the language" and determined that "gross leasable area of the Shopping Center" referred to what was shown on the Site Plan, not to what was actually constructed. (Id.) Several days later, in an email to Moseley, Remus stated "I misspoke in my rent commencement approval request back in May. As you know, the co-tenancy has not been met and we are to pay 50% fixed and additional rent." (Id. Ex. 57; see also Manteca App. Ex. 62.)

In August 2009, Best Buy paid the rent past due under its interpretation of the Co-Tenancy Condition and began making monthly rent payments for fifty percent of the rent. Manteca insisted that because over sixty percent of the buildings that had been constructed were open, it was entitled to full rent under the Co-Tenancy Condition. (Manteca App. Ex. 40.) Manteca issued a Second Notice of Default in January 2010. (Id.) In February 2010, Best Buy began paying the full rent under protest, and filed suit against Manteca. (Best Buy App. Ex. 35; Docket No. 1.) To date, approximately 370,000 square feet other than Best Buy are open and operating at the Promenade and the space next to Best Buy's store, which was originally conceived of as space for two larger tenants, is an empty dirt pad. (Best Buy App. Ex. 46 at 3-6; Kern Dep. II at 41:21-42:24; Best Buy App. Ex. 25 ("Craig Dep. II") at 63:23-64:10.) According to Steven Craig's deposition testimony, he is not aware that Craig Realty has engaged in any discussions with prospective tenants or

created any marketing materials related to the space next to Best Buy, and Craig Realty's efforts have been focused on getting tenants into constructed buildings rather than on finding tenants for and constructing additional buildings. (Craig Dep. II at 128:19-129:19; 145:8-20.)[1]

II. Judicial Notice

A court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

Manteca filed a request for judicial notice that requests the court take notice of three documents: (1) the definitions of "phase" set forth in the Merriam-Webster Dictionary; (2) the definitions of "section" set forth in the Merriam-Webster Dictionary; and (3) a definition of "gross leasable area" from the International Council of Shopping Centers's ("ICSC") Dictionary of Shopping Center Terms. (Docket No. 75.)

With respect to the Merriam-Webster definitions, while courts may consider dictionary definitions when determining the

---

[1] Best Buy filed twelve evidentiary objections to portions of Joshua D. Poag's Declaration and Exhibits 6 and 14 submitted in support of defendant's motion for summary judgment, (Docket No. 142), and Manteca filed twenty-two evidentiary objections to portions of Melissa Moseley's Declaration, C. Paul Wazzan's Declaration, Michael Di Geronimo's Declaration, Joel Hall's Declaration, and associated exhibits, (Docket No. 148). Because the court does not rely on any of the evidence to which the parties object, the court does not find it necessary to rule on these objections.

"plain, unambiguous, and common meanings of terms," U.S. Wealth & Tax Advisory Servs., Inc., 526 F.3d 528, 530 (9th Cir. 2008), they may not judicially notice any matter that is reasonably disputed. Lee v. City of L.A., 250 F.3d 668, 689-90 (9th Cir. 2001). Here, the parties reasonably disagree over the meaning of the words "phase" and "section" in the context of the lease. While the court will take the ordinary definitions of "phase" and "section" found in Marriam-Webster Dictionary into consideration in interpreting the lease, it will not judicially notice these definitions as controlling.

The court also declines to take notice of Manteca's remaining exhibit because it does not satisfy Federal Rule of Evidence 201(b). The definition of "gross leasable area" is subject to reasonable dispute because the ICSC's dictionary is only a compilation of definitions from trade sources. Additionally, it contains multiple possible interpretations of "gross leasable area" in its definition. Manteca may provide the ICSC definition as evidence of how the phrase "gross leasable area" is commonly understood in the shopping center industry, as it did when citing it in its motion for summary judgment. It may not rely on it to establish a definitive definition of the phrase as used in the contract at issue here. The ICSC dictionary cannot be considered authoritative on the meaning of the phrase "gross leasable area" and is therefore inappropriate for judicial notice.[2]

---

[2] Best Buy filed a "Conditional Request for Judicial Notice," in which it requested that the court take notice of additional documents should it grant defendant's request for

III. Discussion

A. Motion to Exclude Best Buy's Experts

Manteca moves to exclude the expert witness testimony of C. Paul Wazzen on the ground that it would constitute impermissible expert opinion and lack relevance, and of Michael Di Geronimo and Joel Hall on the ground that it would lack relevance. (See Docket No. 73.)

This motion, aimed at excluding the expert reports from consideration by the fact finder, is of a type better suited for determination at trial. See Pipkin v. Burlington N. & Santa Fe R.R. Co., No. 04-5591, 2005 WL 5977657, at *1 (W.D. Wash. Oct. 26, 2005) (declining to decide a motion to exclude an expert opinion when raised well in advance of trial); In re Real Estate Assocs. Ltd. P'ship Litig., No. 98-7035, 2002 WL 31027451, at *1-2 (C.D. Cal. Aug. 29, 2002) (acknowledging that exclusion could be argued at trial but holding that a motion to exclude an expert's report and testimony before trial was premature because no party had yet relied upon the report). Accordingly, the court will deny the motion to strike expert reports without prejudice to its renewal at trial.

B. Motion for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

judicial notice. (Docket No. 134.) Since the court does not take notice of defendant's definitions, it will also not take judicial notice of the documents submitted by Best Buy.

P. 56(a).[3] A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id. Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at

[3] Federal Rule of Civil Procedure 56 was revised and rearranged effective December 1, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id.

1. Declaratory Relief and Breach of Contract Claims

Best Buy's first four causes of action for declaratory relief, money paid, money had and received, and breach of contract allege that Manteca failed to satisfy the Co-Tenancy Condition of the lease and then charged Best Buy excessive rent by claiming it had met the condition and threatening Best Buy with eviction.

"The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to . . . 'the mutual intention of the parties at the time the contract is formed . . . .'" Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (1995) (quoting Cal. Civ. Code §§ 1636, 1639). On a motion for summary judgment, a court may properly interpret a contract as a matter of law only if the meaning of the contract is unambiguous. Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 990 (9th Cir. 2006) (citation omitted).

Language in a contract must be construed in light of the instrument as a whole and in the circumstances of the case. Monaco v. Bear Stearns Residential Mortg. Corp., 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008). Language is ambiguous if it "is reasonably susceptible of more than one application to material facts." Dore v. Arnold Worldwide, Inc., 39 Cal. 4th 384, 391 (2006). When a contract provision is ambiguous, therefore,

"ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact." Maffei v. N. Ins. Co. of N.Y., 12 F.3d 892, 898 (9th Cir. 1993) (quoting United States v. Sacramento Mun. Util. Dist., 652 F.2d 1341, 1344 (9th Cir. 1981)).

Although the parol evidence rule prohibits the use of extrinsic evidence where the contract "is intended to be a final expression of that agreement and a complete and exclusive statement of the terms," extrinsic evidence is admissible to explain or interpret ambiguous language. Lonely Maiden Prods., LLC v. Goldentree Asset Mgmt., LP, 201 Cal. App. 4th 368, 376 (2d Dist. 2011) (citing Cal. Code Civ. Proc. § 1856(b), (d)). If there is no material conflict over extrinsic evidence, the court may interpret an ambiguous term as a matter of law. Id. at 377. Summary judgment is inappropriate, however, if the court cannot determine the parties' intent at the time of contracting without judging the credibility of the extrinsic evidence. See City of Hope Nat. Medical Center v. Genentech, Inc., 43 Cal. 4th 375, 395 (2008).

Here, the parties dispute whether the Co-Tenancy Condition has been satisfied. Under Article 8 of the lease, Best Buy must only pay the monthly full rent if, "sixty percent (60%) (not including Best Buy) of the gross leasable area of the Shopping Center are open and operating at the Shopping Center . . . ." (Manteca App. Ex. 1 Art. 8.) The parties' disagreement is centered around their differing interpretations of the phrase "gross leasable area of the Shopping Center." In its previous order denying Manteca's motion to dismiss, the court noted that

both “gross leasable area” and “Shopping Center” were ambiguous terms susceptible to at least two interpretations. (May 12, 2010, Order at 6:1-9:2 (Docket No. 17).)

First, the definition of “Shopping Center” is open to two reasonable interpretations because of the inconsistent use of “Shopping Center” in Article 1. That article provides that

> The premises and improvements and appurtenances constructed and to be constructed thereto (the “Premises”) located at the SE corner of State Highway Route #120 and South Union, in Manteca, California (the “Shopping Center”). The legal description of the Shopping Center is attached hereto as <u>Exhibit A</u> and made a part hereof, and the Shopping Center is outlined in red on the site plan attached hereto as <u>Exhibit B</u> and made a part hereof . . . Nothing contained in this Lease will prohibit Landlord from constructing the Shopping Center at various times, and in various phases or sections . . . The buildings located within phases or sections constructed after the date of execution of this Lease will be deemed to be included within the defined Shopping Center for all purposes of this Lease as of the date that the buildings are fully constructed . . . .

(Manteca App. Ex. 1 Art. 1.) As plaintiff contends, the term “Shopping Center” may be defined as those buildings shown on the Site Plan referred to as Exhibit B. Although there is no red outline on Exhibit B, Manteca’s attorney involved in drafting the lease characterized this omission as an “oversight” that “happens all the time.” (Best Buy App. Ex. 13 (“Schram Dep. II”) at 119:8-120:19.) Alternatively, as suggested by Manteca, the last two sentences, which originate in Poag’s form lease, may provide that buildings only become relevant to co-tenancy calculations once they are “fully constructed.”

Second, the term “gross leasable area” as used in the lease also lends itself to two interpretations. The “gross leasable area” could be interpreted to mean the 743,908 square

feet listed as "Gross Leaseable Area" on the Site Plan that was explicitly incorporated into the lease. (Manteca App. Ex. 1 Ex. B.) "Gross leasable area" could also refer to a number that can only be determined after a building is constructed as suggested by Article 7 of the lease, which provides that "the leasable area of the Premises shall be measured from the center of all common walls and the outside of all exterior walls of the Premises." (Manteca App. Ex. 1 Art. 7.)[4]

The court held in its earlier Order that neither party had established that their interpretation of the relevant terms was correct as a matter of law, and found that the ambiguities in the lease could not be resolved without looking to relevant extrinsic evidence. (May 12, 2010, Order at 9:3-16.) On this motion for summary judgment, both parties have produced evidence tending to support their respective positions with regard to whether the Co-Tenancy Condition was met. Manteca has not shown that the extrinsic evidence proves that its interpretation is correct as a matter of law.

First, evidence of the parties' negotiations does not establish that the interpretation advanced by Manteca was the one intended by the parties when they entered into the lease.

---

[4] The dictionary published by the International Council of Shopping Centers provides that the gross leasable area is "[n]ormally the total area on which a shopping center leases to tenants or is available for lease" and that area available for lease is "measured from the center line of joint partitions and from outside wall faces." This definition, however, states that this is only the "normal" definition, and Manteca has introduced no evidence that the parties incorporated the definitions contained in this dictionary into their agreement or referred to this dictionary when drafting the lease. Accordingly, this definition does not prove the meaning intended by the parties when entering into the lease.

Pointing to Best Buy's disinclination to give it the flexibility to meet co-tenancy by opening a certain square footage of small retail stores or unspecified large retail stores, Manteca contends that in negotiating the Co-Tenancy Condition Best Buy cared primarily that the major tenants named in the lease (J.C. Penney, Bass Pro, and a cinema) be open before full rent would be due. It follows from this, according to Manteca, that the sixty percent limitation was included only to ensure that the Promenade did not feature too many empty buildings, not to ensure that an adequate square footage of businesses was open alongside Best Buy.

The parties' communications, however, do not prove that Best Buy was indifferent to tenants other than the three major tenants specifically named in the lease. It is equally as consistent with the course of the parties' negotiations that Best Buy cared about both smaller and larger tenants, but believed that the sixty percent condition it proposed would ensure that an adequate amount of retail other than the major tenants was open, just as the minimum square footage of small retail included in the Centerra Co-Tenancy Condition had done. (See Moseley Dep. I at 306:12-308:17.) Additionally, there are communications between the parties and between Best Buy employees prior to and after the lease was signed in which Best Buy appears interested in the status of a variety of tenants, indicating that Best Buy was concerned with more than just the major tenants. (See, e.g., Moseley Dep. I at 263:20-264:13, 328:7-22; Manteca App. Ex. 25; id. Ex. 43; id. Ex. 46; Best Buy App. Ex. 52.)

The fact that Manteca negotiated to have flexibility in

deciding how to build the Promenade also does not establish that its interpretation of the Co-Tenancy Condition is correct. Although Manteca may gave included language providing that it could construct the Promenade "at various times, and in various phases or sections," in order to afford it "the flexibility of building and opening buildings as they are leased, and to prevent the possibility of having vacant buildings and spending millions of dollars with them being unleased," (Moll Dep. I at 315:18-317:1; Poag Dep. I at 230:2-21, 233:9-15), this flexibility is not eliminated under Best Buy's interpretation of the Co-Tenancy Condition. Contrary to Manteca's arguments, Best Buy's interpretation would not require Manteca to build the center all at once. Rather Manteca would still be able to build up the Promenade as it found tenants for the proposed buildings, Best Buy would simply not be responsible for the full rent until Manteca successfully opened 446,345 square feet, or sixty percent of the 743,908 square footage indicated on the Site Plan.

Second, evidence of the parties' conduct after the lease was entered into also does not allow the court to conclude that Manteca's interpretation is correct as a matter of law. Manteca claims that the evidence shows that for seventeen months Best Buy acted as if it believed co-tenancy would be established when J.C. Penney opened, until it had a convenient, and money-saving, change of heart in July of 2009. Many of the statements during this period indicating that co-tenancy would be established when J.C. Penney opened, though, were made before September 2008, while Moll was still representing that "the balance of the center" would be open along with J.C. Penney by

March 2009, (Best Buy App. Ex. 50), and that "some small retail" would be open in October 2008, (Moseley Dep. I at 328:17-22). The statements by Best Buy employees, therefore, do not prove that Best Buy believed that J.C. Penney alone would satisfy the co-tenancy condition because, at the time they were made, Best Buy was operating on the assumption that other areas of the center would be opening at around the same time as J.C. Penney. Best Buy may simply have been referring to J.C. Penney by name as the largest of a group of businesses that would together satisfy the Co-Tenancy Condition.[5]

For example, although Moseley indicated in February 2008 that Best Buy would be "on reduced rent until [J.C. Penney] opens," (Manteca App. Ex. 51), a February 2008 email sent by Moseley indicating that Best Buy would be opening in April of 2009 because J.C. Penney had pushed their opening date back to April also noted that the lifestyle part of the shopping center would also be opening in April, (Manteca App. Ex. 52). Even after September 2008, when Manteca cautioned Best Buy that many openings were being delayed and that only half of the small retail was leased, it is not clear that Best Buy could know that the only other tenants that would be open as of March 2009 would be the cinema, Bass Pro, and J.C. Penney. This is because, at

[5] Additionally, the court notes that according to Manteca, no one could know what the Promenade's gross leasable area would be when J.C. Penney opened without first measuring the buildings that had been constructed as of J.C. Penney's opening date. Even estimating this number would have been difficult due to the variable nature of defendant's construction schedule, which depended on when it could secure tenants for planned buildings. Any prospective statements regarding co-tenancy, then, would seem to be necessarily tentative.

the same time that Manteca alerted Best Buy to the delays, it also mentioned that it was in talks with possible tenants for some of the larger retail spaces that were still available. (Manteca App. Ex. 53.)

With respect to the January 2009 emails between Thorn and Moseley, which are particularly relevant as they suggest that an employee involved in negotiating the lease actually investigated whether co-tenancy would be established when J.C. Penney opened, neither woman can recall the circumstances that lead to the email exchange or any follow-up in which the question of co-tenancy was definitively answered. (Moseley Dep. I at 427:1-430:9; Thorn Dep. I at 133:5-137:20.) There is simply not enough evidence concerning the context of these emails and the ultimate conclusion the two women came to regarding co-tenancy to conclude that the meaning of the Co-Tenancy Condition advanced by Manteca is correct as a matter of law. This is especially true in light of the fact that the question of co-tenancy continued to be raised by Best Buy employees in the following months.

After the Best Buy store opened, it took Best Buy several months to work through its internal rent approval process. It appears that at least Remus initially believed that the co-tenancy condition was met when J.C. Penney opened. There is also evidence, however, that this belief was a preliminary opinion that relied on Manteca’s representation that the sixty percent part of the condition was satisfied.

It is not surprising that Remus, who was not involved in the negotiation of the lease and had never worked with a co-tenancy condition before, might have been confused by the

ambiguity in the contract regarding the definition of "Shopping Center" and that Best Buy would not make the ultimate evaluation of co-tenancy based on only her say so. Moseley's email indicating that Remus should submit the rent request does not prove that she agreed with Remus' tenancy calculation. (Manteca App. Ex. 61; Best Buy App. Ex. 27 ("Moseley Dep II") at 441:9-442:4.) Most importantly, evidence that Remus initially determined that the Co-Tenancy Condition was met is contradicted by evidence that after Beine, Remus's manager and the Best Buy employee ultimately responsible for determining if co-tenancy was established, spoke to Moseley about the intent of the language and conducted her own investigation into whether co-tenancy was established, Best Buy came to the opposite conclusion.

That Best Buy waited until several months after its store opened to dispute Manteca's claims that co-tenancy would be established once J.C. Penney opened because the gross leasable area of that store, the cinema, and Bass Pro "surpasses the 60% [gross leasable area] requirement," (Manteca App. Ex. 29), does not prove that Best Buy believed that the Co-Tenancy Condition was met according to the terms of the lease. There was no requirement that Best Buy notify Manteca that co-tenancy was not established in order to trigger the fifty-percent rent reduction, and so Best Buy may simply have been waiting to see what stores were actually open when rent was due in April before contesting the issue. Best Buy can also point out that the converse is equally true--it never notified Manteca that the Co-Tenancy Condition was met.

In their briefs, each party offers explanations of why

its interpretation of the Co-Tenancy Condition is correct and why the other's must fail. Both sides produce extrinsic evidence in support of their interpretations. Manteca's argument does not establish that its position, according to which it need only construct the Best Buy store and two other buildings in order to demand full rent from Best Buy, is correct as a matter of law. Any inferences to be drawn from this conflicting extrinsic evidence are reserved for a jury.

2. Breach of the Implied Covenant of Good Faith and Fair Dealing

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Marsu, B.V. v. Walt Disney Co., 185 F.3d 932, 937 (9th Cir. 1999) (quoting Carma Developers, Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 371 (1992)). "A typical formulation of the burden imposed by the implied covenant of good faith and fair dealing is 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" Andrews v. Mobile Aire Estates, 125 Cal. App. 4th 578, 589 (2d Dist. 2005) (quoting Gruenberg v. Aetna Ins. Co., 9 Cal. 3d 566, 573 (1973)).

To show that a party has not exercised its discretionary power in good faith, a party does not need to show dishonest conduct because "the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." Carma Developers, 2 Cal. 4th at 373; see also Boland, Inc. v. Rolf C. Hagen (USA) Corp., 685 F. Supp. 2d 1094, 1103 (E.D. Cal. 2010) (under California law, party need not show

bad faith conduct to prove breach of implied covenant). Good faith performance of a contract requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." R.J. Kuhl Corp. v. Sullivan, 13 Cal. App. 4th 1589, 1602 (3rd Dist. 1993). Bad faith sufficient to constitute a breach of the covenant of good faith and fair dealing includes conduct described as "inaction," "subterfuge," "lack of diligence," "evasion of the spirit of the bargain," and "abuse of power." Id.

In the First Amended Complaint ("FAC"), Best Buy alleges that Manteca breached the implied covenant of good faith and fair dealing by "failing or refusing to construct, or to fully construct, the buildings that it represented would be constructed, upon the timeline stated for their construction." (FAC ¶ 35 (Docket No. 44).)[6] There was no provision specifying that a certain square footage had to be constructed, but the Site Plan was explicitly incorporated into the lease. The lease affords Manteca the discretion to construct the Shopping Center "at various times, and in various phases or sections," and Best Buy argues that Manteca abused this discretion in violation of

[6] Nowhere in the FAC does Best Buy allege that Manteca promised and failed to build the Promenade as a lifestyle center. Nor has Best Buy sought to file a Second Amended Complaint including such allegations. As "summary judgment is not a procedural second chance to flesh out inadequate pleadings," Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006), the court will not consider Best Buy's assertions regarding Manteca's alleged duty under the contract to build the Promenade as a "lifestyle center." See Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006); Samica Enters., LLC v. Mail Boxes ETC. USA, Inc., No. CV 06-2800, 2010 WL 807440, at *3 (C.D. Cal. Feb. 26, 2010).

the implied covenant.

As pointed out in Gabana Gulf Distribution, Ltd. v. GAP International Sales, Inc., No. C 06-02584, 2008 WL 111223 (N.D. Cal. Jan. 8, 2008), "[t]here are two legal principles in some tension with each other that are at play with respect to the breach of covenant claim" where, as here, a contract gives one party discretion and the second party accuses the first of abusing that discretion. Id. at *7. First, California courts have noted that "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." Carma, 2 Cal. 4th at 372. Second, however, the covenant cannot "be read to prohibit a party from doing that which is expressly permitted by an agreement" because, "as a general matter, implied terms should never be read to vary express terms." Id. at 374. California courts have resolved the tension between these two propositions by "examining whether the contract gives the defendant merely the power to exercise discretion, or whether it gives the defendant the greater power to refrain from acting at all" and declining to apply the covenant in situations where the defendant has the power to refrain from acting altogether. Gabana Gulf Distribution, Ltd., 2008 WL 111223, at *7 (citing Locke v. Warner Bros., Inc., 57 Cal. App. 4th 354, 367 (2d Dist. 1997)).

In Vectren Communications Services v. City of Alameda, No. C 08-3137, 2009 WL 2566722 (N.D. Cal. Aug. 18, 2009), the city of Alameda entered into a contract regarding a telecom system. Id. at *1. The contract specified several features that

had to be included in the system, and granted the city the discretion to make additions to the telecom service "in its sole discretion." Id. at *4. When the city declined to add voice service to the telecom system, the plaintiff sued the city for breach of the implied covenant, alleging that without voice service the economic value of the telecom system decreased, which reduced the plaintiff's economic benefit under the contract. Id. at *6. The court held that there could be no breach of the implied covenant because the agreement contained no requirement that voice service be provided and "conferred complete discretion on the City to decide whether to make any additions or modifications to the system." Id.

Similarly, in Wolf v. Walt Disney Pictures & Television 162 Cal. App. 4th 1107 (2d Dist. 2008), the contract entered into by the parties afforded the defendant "unlimited discretion to grant (or not grant)" third-parties licenses related to a cartoon character and further specified that the defendant "shall not be under any obligation to exercise any of the rights" conveyed by the agreement. Id. at 1121-22. After the defendant exercise its right to issue third-party licenses, the plaintiff sued alleging that the defendant had breached the implied covenant by issuing the licenses for inadequate consideration. Id. at 1121. Relying on the combination of the defendant's right to refrain from issuing any licenses at all and right to grant licences in any manner it "saw fit," the court held that the contract granted the defendant "unfettered discretion" with respect to licensing. Id. at 1122-23. Therefore, the plaintiff could not recover on its claim for breach of the implied covenant. Id.; see also Third

Story Music, Inc. v. Waits, 41 Cal. App. 4th 798, 808-09 (2d Dist. 1995) (plaintiff could not state claim for breach of the implied covenant arising out of defendant's failure to grant a license where contract provided that defendant could "'at [its] election' refrain from all marketing efforts") (alteration in original).

While the lease may provide Manteca with discretion as to when to build the shopping center, Manteca has not pointed to any language that provides it with discretion as to whether to construct the shopping center. Nor has it pointed to evidence suggesting that the parties viewed the construction of the Promenade as hypothetical or contingent at the time of contracting. Moll himself admitted that the parties did not discuss the possibility that not all of the buildings shown on the Site Plan would be built and that "[i]t never crossed [his] mind during this negotiation" whether Manteca had discretion under the lease to build only the Best Buy store out of the buildings shown on the Site Plan. (Poag Dep. II at 119:18-120:12.)

Unlike in the cases above, the lease here did not provide Manteca with "unfettered discretion" as to whether to build the Promenade. Rather, Manteca bargained for discretion with respect to the timing of construction, which it must "exercise[] in good faith." Carma, 2 Cal. 4th at 372. While there is no provision explicitly requiring that Manteca build the shopping center, the implied covenant of good faith may be breached by conduct that, though not prohibited by the contract, is "nevertheless contrary to the contract's purposes and the

parties' legitimate expectations." Pac. Rollforming, LLC v. Trakloc N. Am., LLC, Civil No. 07cv1897-L, 2010 WL 2523946, at *4 (S.D. Cal. June 18, 2010) (quoting Carma, 2 Cal. 4th at 373).

Construction of the Promenade was slowed due to the economic downturn that occurred in 2008. (G. Moseley Dep. II at 197:24-200:24, 201:13-19; Best Buy App. Ex. 14 No. 8; Manteca App. Ex. 31.) Manteca then transferred responsbility for finding tenants for the larger retail spaces to Craig Realty, a non-party to the contract between Manteca and Best Buy, and abandoned plans to lease space next to Best Buy to Dick's Sporting Goods because those plans were inconsistent with Craig Realty's outlet orientation. (Kern Dep. II at 40:20-25; Best Buy App. Ex. 17.) Today, much of the shopping center as shown on the Site Plan has not yet opened for business, including the unconstructed pads next to Best Buy's store.

While Manteca's decisions may have been motivated by legitimate business concerns, legitimate business purposes may coexist with bad faith. See Technical Assistance Int'l, Inc. v. United States, 150 F.3d 1369, 1372 (Fed. Cir. 1998) (noting that "[b]ad faith" under a requirements contract includes actions "motivated solely by a reassessment of the balance of advantages and disadvantages under the contract"). A breach of the implied covenant of good faith and fair dealing arising out of an improper exercise of discretion turns on whether the defendant exercised its discretion "for any purpose within the reasonable contemplation of the parties at the time of formation." Carma, 2 Cal. 4th at 372. Whether Manteca's decisions to delay construction and transfer responsibility for leasing over to a

third party were objectively reasonable and consistent with the parties' contemplation at the time they signed the lease remains a question of fact that must be answered by the trier of fact.

IT IS THEREFORE ORDERED that defendant's motion to exclude plaintiff's experts is DENIED without prejudice to renewal at trial.

IT IS FURTHER ORDERED that defendant's motion for summary judgment be, and the same hereby is, DENIED.

DATED: March 16, 2012

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE